UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| BRYCE C. LASSLE, | CIV. 10-5092-KES |
| Plaintiff, | |
| vs. | ORDER REVERSING AND REMANDING DECISION OF COMMISSIONER |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | |
| Defendant. | |

Plaintiff, Bryce C. Lassle, moves for reversal of the Commissioner of Social Security's (Commissioner) decision denying his applications for disability insurance benefits (DIB) under Title II and for supplemental security income (SSI) under Title XVI of the Social Security Act. The Commissioner opposes this motion.

## PROCEDURAL HISTORY

Lassle filed an application for DIB and SSI on October 1, 2007. Administrative Record (AR) 41. He alleged a disability onset date of May 1, 2001. AR 41. His claims for benefits were denied initially and upon reconsideration. AR 41. Lassle then sought a hearing before an administrative law judge (ALJ), which was held on September 16, 2009. AR 41. The ALJ received the testimony of Lassle, Dr. Robert E. Pelc, a psychological medical expert, and Jerry Gravatt, a vocational expert (VE). AR 41. The ALJ issued an opinion on November 13, 2009, and concluded that Lassle was not disabled. AR 41-53. Lassle requested a review of the determination by the Appeals Council. Joint Statement of Material Facts

(JSMF) 4. The Appeals Council denied the request for review on October 8, 2010. JSMF 4. On December 12, 2010, Lassle commenced this action seeking judicial review of the Commissioner's determination that he is not disabled.

## FACTS

Lassle was born April 7, 1979. AR 139, 145. At the time of the hearing before the ALJ, Lassle was 30 years old. AR 17. Lassle had obtained a high school education. AR 29. The ALJ classified Lassle's past work experience as "Janitor (Carpet Cleaner)." AR 275. Since 2001, Lassle has worked for his father as a carpet cleaning technician. AR 221. Lassle's father has indicated that he makes a number of accommodations due to Lassle's conditions and that he would not employ Lassle were he not his son. AR 224.

### I. Treatment for Mental Impairments

On May 15, 2001, Lassle was admitted to Rapid City Regional Hospital after overdosing on ibuprofen, Tylenol, and cough syrup. AR 303. During this hospitalization, Dr. Richard Renka treated Lassle. AR 307-09. On May 18, 2001, Lassle was discharged from the hospital with a diagnosis of social anxiety disorder, depression, nicotine dependence, cannabis dependence, and polysubstance abuse and given a prescription for Paxil. AR 304.

On May 24, 2001, Lassle was admitted into an outpatient chemical dependency treatment program. AR 311. He was discharged from that program on January 10, 2002, after failing to return for services. AR 311.

Lassle did, however, continue to seek treatment for his mental impairments by meeting with Dr. Renka. On August 13, 2001, Lassle had his

first appointment with Dr. Renka after his hospitalization. AR 371. During that session, Lassle indicated he was in the process of separating from his wife. AR 371. The notes reflect that the week prior to meeting with Dr. Renka, Lassle had attempted to go off his medications to "see if he could do without it." AR 371. Dr. Renka refilled Lassle's prescription for Paxil. AR 371.

The next documented visit occurred on October 21, 2002. AR 369. At that time, Lassle presented with "some evidence of mood instability" despite taking Paxil. AR 369. Dr. Renka noted that Lassle's "[a]ffect was blunted. His mood is mildly depressed. Psychomotor activity is low, if anything." AR 370. Dr. Renka increased Lassle's Paxil dosage from 20 mg, which was prescribed in May of 2001, to 30 mg. AR 369-70.

On November 5, 2002, Dr. Renka met with Lassle. AR 368. He diagnosed Lassle with bipolar affective disorder and a depressed state. He prescribed Lithium and a Lamictal pack so that Lassle would be on a 100 mg dosage by week five. AR 368. At that time, Dr. Renka noted that Lassle's "[c]oncentration [was] poor and recall questionable." AR 368.

Lassle next met with Dr. Renka on December 2, 2002. AR 367. Lassle reported improvements in his condition. AR 367. Dr. Renka continued the prescription for Lithium and kept the dosage of Lamictal at 100 mg. AR 367. Lassle was still doing well when he met with Dr. Renka on January 13, 2003. AR 366. Nonetheless, Dr. Renka adjusted Lassle's medication. AR 366.

In March of 2003, Lassle reported problems with insomnia. AR 365. Dr. Renka again adjusted Lassle's prescription for Lamictal, continued the

prescription for Lithium, and added a prescription for Klonopin. AR 365. Lassle was also admonished to refrain from drinking. AR 365.

Approximately three weeks later, on April 2, 2003, Dr. Renka saw Lassle again. AR 364. The notes reflect that Lassle was doing well and presented with a stable mood. AR 364. Lassle reported that his sleep was improving. AR 364. Dr. Renka kept the medications at their same dosages. AR 364. Similar sentiments were expressed in the visit notes dated May 27, 2003. AR 363.

On August 6, 2003, Lassle met with Dr. Renka. AR 362. He reported anxiety over the upcoming motorcycle rally. AR 362. He stated that he was "queasy and can hardly eat." AR 362. He also reported sleep disturbances in addition to overwhelming anxiety. AR 362. Dr. Renka's notes state that Lassle "appears to have a social phobia." AR 362. He increased the dosages of Lithium and Klonopin and continued the prescription for Lamictal. AR 362.

On November 5, 2003, Lassle reported a stable mood. AR 361. Dr. Renka's notes state Lassle "may need an obligatory companion for certain activities. It is beginning to look like he has more of a panic disorder than a social phobia or perhaps both are true." AR 361. Also noted is Lassle's increasing difficulty leaving home for work trips which last more than one day. AR 361. His medications were continued at their same dosages. AR 361.

In February of 2004, Lassle reported that he was drinking. AR 360. The notes state, "he is slow in his thinking. . . . He truly wants to quit [drinking] but fears AA because of the group size. He hates driving in vehicles and won't come

to Rapid City." AR 360. Dr. Renka attributed Lassle's depressed state to his alcohol use and continued the medications at their same dosages. AR 360.

Dr. Renka also continued Lassle's medications at their same dosages when they met on May 24, 2004. AR 359. A handwritten note on the bottom of the record, however, indicates that Dr. Renka increased the Klonopin dosage in July of 2004. AR 359.

The next documented visit occurred on August 30, 2004. AR 358. On that date, Lassle was anxious but his mood was "relatively stable." AR 358. He indicated high anxiety around groups of people and during the annual motorcycle rally. AR 358. Dr. Renka noted that Lassle's Lithium dosage had previously been increased and maintained the medications as previously prescribed. AR 358.

During a December 2, 2004, appointment, Lassle was "very anxious." AR 357. Dr. Renka noted, "[h]is anxiety rises to the level of panic at times. He has tachycardia and shortness of breath." AR 357. Dr. Renka increased Lassle's dosages of Lithium and Klonopin. AR 357.

Dr. Renka next saw Lassle on March 21, 2005. AR 356. Lassle reported some anxiety and that he thought he was "cycling about every 3 weeks." AR 356. Dr. Renka did not adjust Lassle's medication. AR 356.

On June 14, 2005, Dr. Renka noted that Lassle was somewhat despondent due to lower back pain. AR 355. Dr. Renka stated that Lassle "has all the medication under control at the present time." AR 355.

The next documented visit occurred on February 10, 2006. AR 354. Dr. Renka provided Lassle with samples of Seroquel and continued his other prescriptions at their same dosages. AR 354.

On June 8, 2006, Lassle expressed anxiety due to a family gathering. AR 353. There are also indications of mounting anxiety due to the annual motorcycle rally. AR 353. Dr. Renka's notes state, "[s]ocial anxiety continues but he is comfortable in customer's houses." AR 353. Dr. Renka further opined "[h]e is [in] relative remission but has lots of anxieties and difficulties coping with stress." AR 353.

Lassle next met with Dr. Renka on August 18, 2006. AR 352. The notes state as follows:

> He has been very anxious during the rally as the house was full of people. He has his usual blowup after the rally started rather than before so he thinks he is gaining some control over himself. He is almost incapacitated by anxiety when he goes out of town but on local trips he is usually okay.

AR 352.

The next documented examination was held on December 20, 2006. AR 351. The notes reflect a refill of Clonazepam, a medication not previously mentioned in Dr. Renka's treatment notes. AR 351. Lassle reported that he was "easily agitated and that once a day, he yells at somebody, usually his mother." AR 351. Dr. Renka assessed Lassle's mood as "mid scale or slightly lower." AR 351.

On March 12, 2007, Lassle reported irritability and difficulty with change. AR 350. Lassle reported a panic attack, which included tachycardia and light-

6

headedness due to hyperventilation. AR 350. Dr. Renka states that Lassle "remains stress intolerant and socially phobic." AR 350.

On June 6, 2007, Dr. Renka noted that Lassle's anxiety had decreased because he had been in his home more often. AR 349. Dr. Renka adjusted Lassle's medications and requested that he return in three months. AR 349.

On September 7, 2007, the notes indicate that Dr. Renka suggested meeting with a counselor. AR 348. Dr. Renka noted that Lassle displayed jumbled thoughts due to anticipatory anxiety. AR 348. He also noted that Lassle was "still experiencing occasional serious panic attacks and a high level of generalized anxiety." AR 348.

On September 13, 2007, per Dr. Renka's suggestion, Lassle met with a counselor, Karen Baukol. AR 347. The notes reflected that Lassle was uncomfortable and did not make eye contact. AR 347. Baukol assessed Lassle's Global Assessment of Functioning (GAF) score to be 55 out of 100. AR 347. Baukol met with Lassle again on September 20, 2007. AR 346. His GAF at this meeting was determined to be 60. AR 346. He expressed difficulty in dealing with change and Baukol noted a tendency to avoid conflict until he "can no longer do so and then there will be a blow up." AR 346. On September 27, 2007, Baukol noted Lassle's "strong need for a very tight routine and a schedule[.]" AR 345. There is also a notation that Lassle continued to avoid eye contact. AR 345. Lassle only met with Baukol two additional times and then stopped due to the cost. AR 342-44.

On December 6, 2007, Lassle met with Dr. Renka and reported that he felt that he was doing well. AR 342. He had cut back his dosage of Lamictal because he did not want to unnecessarily medicate. AR 342. Dr. Renka requested that Lassle return in four months for another medication check. AR 342.

The next documented examination by Dr. Renka occurred on August 22, 2008. AR 478. Lassle reported several "blowups" with family members during August. AR 478. Dr. Renka noted that Lassle "seem[ed] quite dejected and negative." AR 478. The assessment portion of the report states "[c]hronically anxious and unhappy, negative and tending to somatize." AR 478. The August 22, 2008, note shows that the Clonazepam dosage had been increased, but the exact date of this increase is unknown. AR 478.

On November 18, 2008, Dr. Renka noted that Lassle's speech was slow and that Lassle was "willing to try something more for his difficulties." AR 477. Dr. Renka prescribed an additional medication, Abilify. AR 475. All of Lassle's medications were all continued on February 12, 2009. AR 476.

Dr. Renka next saw Lassle on May 8, 2009. AR 475. Lassle was unable to receive Abilify through the medication assistance program. AR 475. Dr. Renka, however, was able to supply him with samples and renewed Lassle's prescriptions for Lithium, Clonazepam, Clonidine, and Lamictal. AR 475.

Lassle's last visit with Dr. Renka prior to the hearing before the ALJ occurred on August 10, 2009. AR 474. Dr. Renka noted Lassle had been "having a lot of anxiety attacks leading up to the rally but not so many during the rally." AR 474. He further noted Lassle was "[c]hronically anxious[.]" AR 474. Dr. Renka

again supplied Lassle with samples of Abilify and continued his other medications as previously prescribed. AR 474.

## II. Treatment for Physical Impairments

In addition to alleging that he was disabled due to mental impairments, Lassle also alleged he was disabled due to a hiatal hernia and back pain.

On March 26, 2004, Lassle presented with abdominal pain. AR 332. An H. pylori test was performed with negative results and a prescription for Nexium was given. AR 331. On July 6, 2004, Lassle sought treatment for nausea and vomiting. AR 330. Lassle was told to reduce his alcohol and tobacco use and a "barium swallow" was ordered. AR 330. On July 8, 2004, an "upper GI and small bowel followthrough" was performed. AR 329. The examination indicated a "small sliding type hiatal hernia." AR 329. The record does not reflect any suggested course of treatment for this condition.

On July 23, 2008, Lassle sought treatment at the Community Health Center of the Black Hills for back pain. AR 464. The physician noted some "tenderness along the paraspinal musculature of the lumbar spine." AR 464. Flexeril and Toradol were prescribed. AR 465.

Lassle was next seen for back pain on August 19, 2008. AR 462-63. The physician assessed the problem to be "musculoskeletal pain based on prior injuries and presumably degenerative disease." AR 463. An addendum states that "[i]t is likely gout that contributes to his pain." AR 463. He was also prescribed Meloxicam. AR 463. This medication was continued at Lassle's next examinations on September 16, 2008, and on December 16, 2008. AR 460-61.

On July 24, 2009, Lassle again sought treatment for back pain. AR 455. He was assessed to have left sciatic neuritis and acute musculoskeletal spasm of the lower back. AR 455. He was given a steroid and lidocaine injection, and prescribed ibuprofen and Flexeril. AR 455.

Additionally, from August of 2002 through the date of the hearing, Lassle had sought treatment with Dr. Roy Trotter, a chiropractor at Black Hills Chiropractic, for back pain. AR 378-404, 408-27. Dr. Trotter completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) on October 1, 2008. AR 445-51. Dr. Trotter stated that Lassle suffered from chronic pain that varied from "day-week to month." AR 445. Dr. Trotter opined that Lassle could "frequently lift up to 20 pounds, continuously lift up to 10 pounds, carry up to 20 pounds continuously, sit for 30 minutes at a time, stand for 2 hours at a time, and walk for 1 hour at a time." JSMF 33; AR 445-46.

### III. ALJ's Decision

The ALJ determined that Lassle was not disabled. AR 41-53. In forming this conclusion, the ALJ used the mandatory five-step sequential evaluation process.[1] The ALJ first determined that, although he had worked for his father,

---

[1] Under this five-step process, "[t]he ALJ first determines if the claimant is engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled. Fifth, the ALJ determines whether the claimant

Lassle had not engaged in substantial gainful activity since May 1, 2001, the alleged disability onset date. AR 43. At step two, the ALJ determined that Lassle suffered from the following severe impairments: depression not otherwise specified versus a bipolar disorder, social anxiety disorder, and a history of polysubstance abuse of alcohol and marijuana. AR 44. The ALJ then determined that Lassle's severe impairments did not meet or equal a listed impairment. AR 44-45. The ALJ next concluded Lassle's residual functional capacity (RFC) to be as follows:

> the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: mild limitations (i.e., there is a slight limitation in this area but the claimant can generally function well) in an ability to understand and remember simple instructions, carry out simple instructions, make judgments on simple work-related decisions, moderate limitations (i.e., there is more than a slight limitation in this area, but the claimant is still able to function satisfactorily) in an ability to understand and remember complex instructions, carry out complex instructions, make judgments on complex work-related decisions, interact appropriately with supervisors, interact appropriately with co-workers, and respond appropriately to usual work situations and to changes in a routine work setting, and a "moderate to marked" limitation in an ability to interact appropriately with the public, who thus can cognitively perform 3 to 5 step instruction jobs but needs to avoid large crowds but can deal with customers, family and friends.

AR 45-46. In reaching this conclusion, the ALJ rejected the opinion of the treating physician as well as Lassle's subjective complaints. AR 46-51. The ALJ then presented the RFC to the VE. AR 52. The VE testified that under the RFC

---

can perform other jobs in the economy. If so, the claimant is not disabled."
*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010).

set forth by the ALJ, Lassle would be able to perform the job of production assembler. AR 52. As a result, the ALJ found that Lassle was not disabled. AR 52.

## STANDARD OF REVIEW

An ALJ's decision must be upheld if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g). "Substantial evidence is 'less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.' " *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Maresh v. Barnhart*, 438 F.3d 897, 898 (8th Cir. 2006)); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971) (reasoning that substantial evidence means "more than a mere scintilla." (citations omitted)). In determining whether substantial evidence supports the ALJ's decision, the court considers evidence that both supports and detracts from the ALJ's decision. *Moore v. Astrue*, 623 F.3d 599, 605 (8th Cir. 2010) (internal citation omitted). As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have determined the case differently. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)).

In determining whether the Commissioner's decision is supported by substantial evidence, the court reviews the entire administrative record and considers six factors: (1) the ALJ's credibility determinations; (2) the claimant's vocational factors; (3) medical evidence from treating and consulting physicians;

(4) the claimant's subjective complaints relating to activities and impairments; (5) any third-party corroboration of claimant's impairments; and (6) a vocational expert's testimony based on proper hypothetical questions setting forth the claimant's impairment(s). *Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d 581, 585-86 (8th Cir. 1992) (citing *Cruse v. Bowen*, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The court also reviews the Commissioner's decision to determine if an error of law has been committed, which may be a procedural error, the use of an erroneous legal standard, or an incorrect application of the law. *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted). Issues of law are reviewed de novo with deference accorded to the Commission's construction of the Social Security Act. *Id.* (citing *Juszczyk v. Astrue*, 542 F.3d 626, 633 (8th Cir. 2008)).

## DISCUSSION

Lassle alleges that the ALJ made two reversible errors. First, Lassle alleges that the ALJ improperly discounted the opinion of his treating physician. Second, Lassle alleges that the ALJ erred in determining that his subjective complaints were not credible.

### I. Treating Physician

The Eighth Circuit has held that "[a] treating physician's opinion should not ordinarily be disregarded[.]" *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citing *Ghant v. Bowen*, 930 F.2d 633, 639 (8th Cir. 1991)). Title 20 of the Code of Federal Regulations, section 404.1527(d)(2) provides:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations[.]

In his opinion, the ALJ reached the following conclusion:

> Dr. Renka's opinions of the claimant's function status is not entitled to controlling weight pursuant to Social Security Ruling 96-2p for the following reasons. The check-marked opinions are not well supported by objective clinical evidence, testing, or mental status examinations. Furthermore, such opinions are not supported internally by Dr. Renka's own treatment notes, and they also conflict with other evidence in the record which indicates the claimant's functioning is less severe than those opined by Dr. Renka. In sum, in consideration of the record as a whole, the undersigned accords less weight to the opinions of Dr. Renka, and greater weight to the opinions of Dr. Pelc [a non-examining medical expert].

AR 48. The court finds that this conclusion is not supported by the record.

First, Dr. Renka's opinion is not inconsistent with his own treatment notes. Dr. Renka treated Lassle from May of 2001, when Lassle was hospitalized for a suicide attempt, through August of 2009. AR 342-77, 474-78. The notes reveal an individual whose condition has varied over the course of eight years. In particular, the ALJ found it inconsistent for Dr. Renka to find Lassle was limited in social interactions while the record reflected that he "works in peoples [sic] homes," coaches youth soccer, and engages in "social activities." AR 49. The record, however, indicates that Lassle worked as a carpet cleaning technician for his father, who made numerous accommodations for Lassle's mental impairments. AR 221. Moreover, nothing in the record indicates the amount of contact Lassle had with the customers. Dr. Renka's notes indicate that Lassle

14

lets his father handle the customers. AR 350. Furthermore, the record reflects that when Lassle attempted to work without the presence of his father, he was unable to complete the jobs. AR 25. Additionally, there are other notations in the record indicating Lassle relies on the presence of another individual in order to function in public, even to attend his medical appointments. AR 345, 350, 357, 361, 365. The court finds that these behaviors are consistent with Dr. Renka's finding of marked limitations in dealing with the public, getting along with co-workers, or having "agoraphobia due to panic attacks and social anxiety." AR 538-39.

    A further review of the record shows that Dr. Renka's opinion is not inconsistent with the record as a whole. A comparison of Dr. Renka's assessment with the assessment of Dr. Pelc, the medical expert, shows that the two physicians essentially agree with regard to Lassle's limitations. For instance, Dr. Renka concluded that Lassle suffered no limitations regarding the ability to understand short, simple instructions and a moderate limitation in understanding detailed instructions. AR 537. Dr. Pelc found that Lassle suffered a mild limitation regarding the ability to understand simple instructions and a moderate limitation in understanding complex instructions. AR 442. Dr. Renka found Lassle had a marked limitation in the ability to interact with the public and getting along with co-workers and a moderate limitation in responding to supervisors. AR 538. Dr. Pelc found a moderate to marked restriction in his ability to deal with the public and a moderate restriction in dealing with co-workers and supervisors. AR 443. Both found a moderate limitation in the ability

15

to adapt to changes in a routine work setting. AR 443, 538. Additionally, Dr. Matthews, another of Lassle's treating physicians, noted that he reviewed Dr. Renka's reports and believed "Dr. Renka has things fairly well in hand." AR 460.

The Eighth Circuit has held that " '[a] treating physician's opinion is due controlling weight if that opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.' " *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) (quoting *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001)). The court finds the ALJ's supposition that Dr. Renka's opinion is inconsistent and not supported by the record is without merit. Dr. Renka's opinion is supported by substantial evidence in the record. The ALJ erred in failing to give the proper weight to Dr. Renka's opinion. As a result, the court finds the ALJ's disability determination is in error.

## II.     Credibility

Lassle also alleges that the ALJ erred when determining that his subjective complaints were not credible. In assessing a claimant's credibility, the ALJ is required to consider certain factors. *See* SSR 96-7p, 1996 WL 374186 (July 2, 1996); *Polaski v. Heckler*, 739 F.2d 1320, 1321-22 (8th Cir. 1984). These factors include "the claimant's daily activities; the location, duration, frequency, and intensity of her symptoms; factors that precipitate and aggravate the symptoms; medication and other treatment for relief of symptoms; information and observations by treating and examining physicians and third parties regarding

the nature and extent of her symptoms[.]" *Polaski*, 739 F.2d at 1321-22. But "[an] ALJ [is] not required to discuss methodically each *Polaski* consideration, so long as he acknowledge[s] and examine[s] those considerations before discounting [the claimant's] subjective complaints." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (citing *Brown v. Chater,* 87 F.3d 963, 966 (8th Cir. 1996)). Additionally, "[w]here adequately explained and supported, credibility findings are for the ALJ to make." *Id.* (citing *Tang v. Apfel*, 205 F.3d 1084, 1087 (8th Cir. 2000)).

The ALJ found that Lassle's complaints regarding his back pain were not fully credible given that he continues to "lift 30 to 40 pounds frequently and 99 pounds maximum, and walks 6 hours a day, stands 6 hours a day, and sits 1 hour a day." AR 46. This information was given by Lassle himself. AR 203-05. As a result, the court finds that this portion of the ALJ's credibility determination is supported by substantial evidence.

The ALJ also found that Lassle's complaints regarding his mental impairments were not credible. AR 47. In so finding, the ALJ stated Lassle is "reasonably capable of performing activities of daily living, as well as cognitively functioning at an adequate level." AR 47. The ALJ further identified a number of activities in which Lassle is involved. AR 47. The record, however, corroborates Lassle's complaints regarding his mental impairments.

First, the ALJ cited, in support of finding Lassle's complaints not credible, that he had "worked 60 hours at an auto body job in 2002[.]" Lassle asserts that this work occurred prior to the alleged onset date of disability. Lassle's assertion though is contradicted by a notation in Dr. Renka's notes on October 21, 2002.

AR 369. The notes refer to the auto body job and additionally state that Lassle "blew up and quit." AR 369.

The ALJ also noted from this same report that Lassle "finds himself humming and singing while working on carpets[.]" AR 47. But this was taken out of context. Dr. Renka's note states, "[t]here is some evidence of mood instability. He is irritable at times and at other times he finds himself humming and singing while working on carpets. He can't identify a pattern." AR 369. That same day, Dr. Renka diagnosed Lassle with "significant depression" and deemed his social anxiety disorder at that time as mild. AR 370. He then increased Lassle's prescription for Paxil. AR 370. Interestingly, at Lassle's next visit with Dr. Renka, approximately 15 days later, Lassle was diagnosed with Bipolar Affective Disorder and his medication was adjusted again. AR 368. Thus, rather than undermining Lassle's credibility, this statement supports Lassle's claim that he is impaired by unstable moods.

The ALJ further cited Lassle's socialization with friends in support of his finding that Lassle was not credible, but the record reflects that this socialization mainly consists of telephone conversations and an occasional visit coinciding with alcohol use to quell anxiety. AR 347, 352, 360. The ALJ also pointed out Lassle goes shopping. Again, the record reflects that this is also a rare occurrence which happens only when there "isn't a lot of traffic" or for short durations. AR 352. The ALJ further cited the fact that Lassle has played pool as proof that his complaints are not credible. Again, the record reports that Lassle plays pool "on rare occasions." AR 361. Moreover, much is made of Lassle's

coaching youth soccer. Lassle testified, however, that he does not appear for all the practices or games and that "[t]he association doesn't like [his absences] very much." AR 24.

The court finds that the "inconsistencies" referred to by the ALJ "reflect nothing more than [Lassle's] condition varies, and at certain times is more severe than others." *Ross v. Apfel*, 218 F.3d 844, 848 (8th Cir. 2000). While the record indicates that Lassle has attempted to engage in social activities and overcome his limitations, the record also evidences a lack of success.

Furthermore, the court finds that the ALJ's credibility determination was influenced by the ALJ's rejection of Dr. Renka's opinion. In rejecting Dr. Renka's opinion, the ALJ determined that the medical evidence did not support Lassle's subjective complaints. The court, having previously determined that Dr. Renka's opinion was supported by the medical evidence, finds that proper consideration of Dr. Renka's opinion would have had an effect on the ALJ's credibility determination. As a result, the court finds the credibility determination to be in error.

### III. Award of Benefits

At the evidentiary hearing, the ALJ questioned the VE regarding Lassle's ability to perform jobs in the economy. AR 28-30. The VE testified that under the RFC set forth by the ALJ there were jobs in the economy which Lassle could perform. AR 29. But if Dr. Renka's assessment was accepted, the VE testified that he could not identify any jobs that Lassle would be able to perform due to his "inability to work with other individuals, and be able to stay on task for a full

eight hour day." AR 30. The Eighth Circuit has "repeatedly held, the inquiry must focus on the claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.' " *Tang*, 205 F.3d at 1086 (quoting *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982)). Having determined that Dr. Renka's opinion is supported by the record and given the testimony of the VE that under Dr. Renka's assessment there are no jobs which Lassle could perform, the court finds that the matter should be remanded to the Commissioner with the direction to find Lassle disabled and award benefits. Accordingly, it is

ORDERED that the motion to reverse the decision of the Commissioner is granted.

IT IS FURTHER ORDERED that the matter is remanded to the Commissioner for an award of benefits and further proceedings consistent with this opinion.

Dated March 16, 2012.

                                                BY THE COURT:

                                                /s/ *Karen E. Schreier*
                                                KAREN E. SCHREIER
                                                CHIEF JUDGE